

# NUMBERS 13-14-00108-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JOSE FRANCO, III,**                                                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                    **Appellee.**

---

### On appeal from the 117th District Court
### of Nueces County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Benavides, Perkes and Longoria
### Memorandum Opinion by Justice Perkes

Appellant Jose Franco, III, appeals his conviction on two counts of injury to a child,

a first degree felony, and two counts of injury to a child, a third degree felony.[1]   *See*

---

[1]  Amanda Gonzales was tried as a co-defendant and convicted on all counts.   Her conviction was previously affirmed in a separate case.   *See Gonzales v. State*, No. 13-14-00103-CR, 2015 WL 1020630 (Tex. App.—Corpus Christi Mar. 5, 2015, no pet.) (mem. op., not designated for publication).

TEX. PENAL CODE ANN. § 22.04 (West, Westlaw through 2015 R.S.). A jury returned a verdict of guilty and assessed punishment on the four counts to concurrent terms of thirty, twenty, seven, and two years' imprisonment, respectively. By seven issues, which we treat as three, appellant argues: (1) the evidence is insufficient to support three of his convictions for injury to a child; (2) appellant was egregiously harmed by error in the jury charge; and (3) appellant's trial counsel was ineffective. We affirm.

## I.    BACKGROUND

The following evidence was adduced at trial. Appellant lived with his girlfriend Amanda Gonzales. The victim, J.F.,[2] appellant's thirteen-year-old son, and his three siblings[3] resided in the home, along with Gonzales's two children. On May 12, 2013, appellant asked his sister, A.T., if J.F. could reside with her because J.F. was "out of control." A.T. testified that she met appellant at his place of work, at which time appellant stated that Gonzales "wouldn't let [J.F.] shower, she would make him sleep in his poop and pee, and [J.F.] smelled like a homeless person." Appellant also told her that J.F. had bruises on his bottom. A.T. agreed to have J.F. live with her. A.T. testified that J.F. told her he did not eat anything for dinner within the last week except for one cold hot dog on Friday night, and he had only a cold hot dog earlier that morning, which was a Sunday. J.F. told A.T. that Gonzales recently hit him on the head with the point of a boot resulting in a gash to his head. He also stated that he was forced to stand in the corner when he got home from school until 1:00 a.m., and from 6:00 a.m. to 1:00 a.m. on weekends. J.F.

---

[2] We refer to the victim, his minor siblings, and other family members by their initials to protect their identity.

[3] One of the siblings is the biological son of Gonzales and appellant.

stated he had defecated on himself that morning because he was not allowed to use the bathroom, and, in response, Gonzales hit him thirty times with a belt and ten times with a piñata stick. J.F. told A.T. that he was allowed thirty seconds to use the restroom, and Gonzales and the other children in the home would hit him if he went over his time. J.F. explained that Gonzales made him wear diapers because he would have accidents, and she forced him to wear soiled diapers which resulted in swelling to his private area causing him pain.

After feeding J.F., A.T. brought him home and observed extensive bruising to his bottom. She noted that J.F.'s legs were "really red and swollen" and he looked very skinny. A.T. took photographs of J.F. depicting his physical appearance and injuries, which were admitted at trial. A.T. asked J.F. to take a shower, but she had to identify the shampoo, conditioner, and soap because he did not know how to use them. A.T. then contacted the Corpus Christi Police Department who dispatched an officer to A.T.'s residence. After A.T. expressed her concerns regarding J.F.'s treatment, the officer instructed her to take J.F. to Driscoll Children's Hospital the next morning.

Upon arrival at Driscoll Children's Hospital, J.F. was seen by Dr. Nancy Harper, a pediatrician certified in child abuse pediatrics and member of the Child Abuse Resource and Evaluation Team. Dr. Harper testified regarding her interview with J.F, during which he reported mistreatment by Gonzales and appellant that was consistent with his earlier report to A.T. In addition, J.F. clarified that he is forced to stand in the corner, facing the wall with his hands behind his back, from 6:30 a.m. until approximately midnight except when he is at school. J.F. told Dr. Harper that he is not allowed to drink anything at

3

home, he did not eat dinner from Tuesday to Saturday of the previous week, and he only ate a hot dog with nothing to drink on Saturday, before eating one hot dog on Sunday morning. J.F. explained Gonzales usually spanks him thirty times with a belt and ten times with a wooden piñata stick. He also stated that appellant spanks him with a belt on his bottom, and his brothers and sisters are encouraged to hit him. J.F. stated that Gonzales and appellant make him wear a diaper to school, that he bathes once a week, and that he does not have a toothbrush. J.F. told Dr. Harper that he was required to stand the entire time he was at home and awake since approximately 2010.

Dr. Harper testified concerning her physical examination of J.F. She explained she observed a rash on J.F.'s thighs which was consistent with walking around in soiled diapers. Dr. Harper also noted leg swelling from J.F.'s prolonged standing, and a one centimeter scar on J.F.'s head. Dr. Harper testified that J.F. exhibited multiple injuries that active children should not have, including what appeared to be grip marks on his upper arms and bruising on his buttocks and thighs. She stated that J.F. was so extensively bruised in these areas that the bleeding could have caused him to go into shock which could lead to "collapse and death." She also explained that such injuries can result in the breaking down of the muscles leading to kidney failure, or fat in the bloodstream causing pulmonary embolisms, which is potentially life-threatening.

Dr. Harper explained that based on her review of prior medical records, J.F. had not maintained his prior growth rate. She also stated J.F. was getting far less calories than his body needed. Dr. Harper diagnosed J.F. with "inflicted injury or physical abuse, with multiplanar cutaneous trauma, meaning that he had trauma on multiple planes of his

4

body[,]" and a concern for "child torture" and "scapegoating."  Regarding, child torture,

Dr. Harper explained as follows:

> We become concerned about torture when it's more than just multiple episodes of corporal punishment.  When we see concerns . . . that there has been intentional infliction of pain and suffering, physical, psychological on a child, more than just what you see from a belt, a stick, or another weapon. When you also see these other aspects of humiliation, isolation, forced positions or constraint of movement, denial of basic necessities, like the ability to have proper clothing, go to the bathroom when you need to, be able to drink water when you're thirsty, when we see all of those features, it meets the same criteria that the United Nations uses for torture in other areas of the world during conflict.

Dr. Harper further diagnosed J.F. with a concern for refeeding syndrome, a life-threatening condition caused by malnutrition, which she described as follows:

> [W]hen you take a person who is starving, you basically take someone who no longer has a source of carbohydrates in their diet, you know, like, pasta, rice, they don't have carbohydrates coming in, to break down, to make glucose or energy for their body, for their brain, for their muscles. When you go into that period of starvation, you enter something called catabolism, where your body starts to break down your muscles and your fat to provide energy. . . . Basically, you digest muscle, whether it's your body skeletal muscles that you've used for exercise, your heart muscle, brain, liver, internal organs, it doesn't discriminate.
>
> . . . .
>
> As soon as the person who is in starvation is then fed a normal diet that contains glucose, carbohydrates, you get surges of insulin coming from your pancreas.  It's as if your body doesn't regulate itself well, and you get too much of the insulin secreted.  As soon as that process starts, multiple things happen that can be life-threatening.  Critical electrolytes that you need for your heart function, like potassium, phosphorous, magnesium, they go into cells, because of the insulin, and to lower your blood stream.
>
> So you can have a heart rhythm problem, you can have heart failure. Insulin also tells your kidneys to hold on to fluid and sodium. So, then you get swelling in your body and you can also develop congestive heart failure. There are multiple things that happen in this process. Your intestines often slow down when the phosphorous drops and when you start to feed them,

5

the stomach stops doing its job well, called gastroparesis, it becomes all bloated and it doesn't empty properly. So, there are multiple things that happen when you start to feed them.

Dr. Harper discharged J.F. and asked that he return the next day for follow-up testing. The next day Dr. Harper confirmed J.F. was suffering from refeeding syndrome after reviewing further lab results, and admitted J.F. for in-patient treatment. Dr. Harper testified that it was her medical opinion that, without medical intervention, J.F. was at a substantial risk of death due to refeeding syndrome. Over the next three days, J.F. was administered a calorie-restricted diet that was gradually increased until he could tolerate 1,500 calories-per-day. Dr. Harper examined the other children in the home and noted none of them showed signs of malnutrition or starvation. Photographs of J.F. taken during the course of his examination and treatment were admitted into evidence.

Detective Rodney Cantu with the Corpus Christi Police Department was assigned to investigate the reported child abuse. Detective Cantu obtained consent from Gonzales and appellant to search the residence, where he discovered the belt and piñata stick identified by J.F., both of which were admitted into evidence at trial. Detective Cantu testified there was an abundance of food at the residence, including a full refrigerator, freezer and pantry, as well as dry goods on the kitchen counter. Detective Cantu took photographs of the apartment which were admitted at trial.

Detective Cantu interviewed appellant, who admitted to spanking J.F. with a belt and a piñata stick. Appellant also admitted that J.F. spent a large amount of time in the corner while at home and was only allowed a limited amount of time in the bathroom. Appellant told Detective Cantu that he "knows what he did was wrong and that [J.F.] did

6

not deserve the bruises that he received on his backside." Appellant further stated to Detective Cantu that he was aware J.F. was not properly fed, was required to spend long periods of time standing, needed permission to use the bathroom, was not allowed to drink water at home, and would only eat a hot dog or two for the entire day on the weekends. Appellant explained that he did not protect J.F. because he feared retaliation by Gonzales.

Three of the other children in the home testified at trial and corroborated that J.F. was not allowed to eat, go to the bathroom, or take a shower without permission. They also testified that J.F. was required to wear a diaper and stand in the hallway for long periods of time. The children stated that J.F. was required to sleep in the hallway with no mattress, pillow, or blanket. C.P., J.F.'s ten-year-old sibling, testified that he witnessed appellant hit J.F. with a belt and a stick. He also observed appellant hold J.F. against the wall by his neck until J.F. almost passed out. C.P. testified that Gonzales or appellant would hold J.F. down so that the other could hit J.F. C.P. confirmed that sometimes J.F. would only eat one hot dog for a whole day.

I.F., J.F.'s twelve-year-old sibling, testified that both Gonzales and appellant would hit J.F., and that J.F. would get spanked with a belt, a wire from the vacuum, and a piñata stick. He testified that Gonzales would hit J.F. on the head with the tip of a high-heel boot. I.F. stated that J.F. was required to stand in the hallway with his hands behind his back until he went to bed. He confirmed that J.F. was not allowed to play on the weekends, but would be forced to stand all day in the hallway. J.F. was not allowed to eat school breakfast, but was instead given corn flakes in a zip-lock bag. I.F. testified

7

that Gonzales cut the pockets out of J.F.'s pants and did not allow him to carry a backpack to prevent J.F. from concealing food. I.F. explained that J.F. would sometimes have to wear his sister M.F.'s clothes. I.F. stated that Gonzales would force him to hit J.F. at times.

M.F., J.F.'s fourteen-year-old sibling, testified that when J.F. urinated on the floor, appellant would rub J.F.'s nose in it where the accident occurred. M.F. also testified that Gonzales and appellant told the children to lie about whether J.F. was being given food.

J.F. testified concerning his treatment at the hands of Gonzales and appellant. His testimony was consistent with his earlier reports to A.T. and Dr. Harper. He further testified that he would sometimes go several days without eating dinner. J.F. stated that he was required to wear diapers, and that he was not allowed to change if he had an accident. J.F. stated that he was forced to wear smelly clothes to school. He explained that he slept in the hallway without a mattress, blankets or pillow.

Several officials from J.F.'s school testified concerning their observations. The school counselor testified that J.F. wore the same dirty, smelly clothes every day, and that he never had a jacket during cold weather. J.F.'s physical education teacher believed that J.F. looked sickly and had seen him eating things off the ground. Three of J.F.'s teachers testified that they would observe J.F. taking food from the trash and that he had a strong odor.

Dr. Robert Rios, a licensed psychologist, conducted a psychological assessment of J.F. Dr. Rios stated that J.F. was able to give a detailed account of what had occurred in the home. Dr. Rios opined that the purpose of requiring J.F. to wear a diaper was

8

humiliation. Dr. Rios diagnosed J.F. with neglect, physical abuse, attention deficit disorder and post-traumatic stress disorder (PTSD). Dr. Rios stated that the three years of abuse suffered by J.F. were sufficient to cause PTSD. Dr. Rios also concluded that the treatment J.F. suffered caused him serious mental injury.

Julie Thigpen, a licensed professional counselor, conducted weekly therapy sessions with J.F. during the months preceding trial. Thigpen testified that J.F. emotionally presents himself as a child along the age of seven to nine years, rather than his current age of thirteen years. Thigpen explained that this is consistent with children who have suffered trauma which "often causes arrests in their development." Thigpen testified that J.F. has exhibited feelings of self-blame and detachment from others, and that J.F. has complained he is often unable to sleep. Thigpen concluded that Gonzales's and appellant's treatment of J.F. has caused J.F. serious mental injury and "changed who he is." Thigpen testified that J.F.'s healing will be difficult and will take a long time.

Dr. Wayne Duehn, a psychologist specializing in child abuse and neglect, conducted a psychological and social evaluation of J.F. and his family. Dr. Duehn characterized J.F.'s treatment by Gonzales and appellant as "scapegoating." He explained that such treatment causes the victim to think of himself as bad, creating a pervasive distrust of the world, and delays the victim's ability to relate to peers.

The jury found appellant guilty on all counts. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

By his first four issues, appellant argues the evidence is insufficient to support his conviction on counts one, two and three. Appellant does not challenge count four.

9

## A.    Standard of Review and Applicable Law

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"   *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.).   The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony.   *Brooks*, 323 S.W.3d at 899; *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008).   Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province.   *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). We resolve any inconsistencies in the testimony in favor of the verdict.   *Bynum v. State*, 767 S.W.2d 769, 776 (Tex. Crim. App. 1989) (en banc).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge.   *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).   Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.   *Id*.

In Count 1 of the indictment, the State alleged that appellant committed injury to a child, a first degree felony, by causing serious bodily injury to J.F.   *See* TEX. PENAL CODE

Ann. § 22.04. The hypothetically correct jury charge for this offense required the State to prove beyond a reasonable doubt that appellant: (1) intentionally or knowingly; (2) caused serious bodily injury; (3) to a child—a person fourteen years of age or younger. *See id.* § 22.04(a)(1), (c)(1), (d).

In Count 2 of the indictment, the State alleged that appellant committed injury to a child, a first degree felony, by causing a serious mental deficiency, impairment or mental injury to J.F. *See id.* § 22.04. The hypothetically correct jury charge for this offense required the State to prove that appellant: (1) intentionally or knowingly; (2) caused a serious mental deficiency, impairment or mental injury; (3) to a child—a person fourteen years of age or younger. *See id.* § 22.04(a)(2), (c)(1), (d).

In Count 3 of the indictment, the State alleged that appellant committed injury to a child, a third degree felony, by causing bodily injury. *See id.* § 22.04. The hypothetically correct jury charge for this offense required the State to prove that appellant: (1) intentionally or knowingly; (2) caused bodily injury; (3) to a child—a person fourteen years of age or younger. *See id.* § 22.04(a)(3), (c)(1), (f).

## B. Analysis

### 1. Count 1

By his first issue, appellant argues "[t]he evidence is insufficient to show [appellant] knowingly and intentionally caused serious bodily injury by withholding nutrition." Specifically, appellant contends that the evidence is insufficient to establish "[appellant] intended or knew the result of his action would be serious bodily injury to [J.F.]"

11

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The State must prove that a defendant caused a child's serious bodily injury with the requisite criminal intent. *Id.* "Serious bodily injury" is a "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (West, Westlaw through 2015 R.S.). A person acts intentionally with respect to the result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a) (West, Westlaw through 2015 R.S.). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably likely to cause the result. *Id.* § 6.03(b).

Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). It can also be inferred from circumstantial evidence, such as acts, words, and appellant's conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Furthermore, a jury is "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence." *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Appellant maintains there is no evidence "indicating [appellant] intended or knew [J.F.] was suffering or would suffer serious bodily injury from malnutrition." We disagree. Multiple witnesses testified that appellant participated with Gonzales in a pattern of

12

denying adequate food and nutrition to J.F. J.F. was not allowed to drink water in the home, and his daily diet while at home would often consist of one hot dog. This testimony was corroborated by expert medical testimony that J.F. suffered the resulting effects of starvation. Further, appellant admitted to Detective Cantu that he was aware J.F. was not being properly fed. We conclude a rational trier of fact could have inferred from this evidence that appellant either intentionally or knowingly caused serious bodily injury to J.F. *See Johnson*, 364 S.W.3d at 293–94. We overrule appellant's first issue.

### 2. Count 2

By his second issue, appellant argues "[t]he evidence is insufficient to show [appellant] knowingly and intentionally caused serious mental deficiency, impairment or injury" to J.F. With respect to causation, appellant contends that there is no evidence from which the jury could determine whether J.F.'s present mental condition was due to traumas that he witnessed at an earlier age prior to coming into appellant's care, including the death of his mother and witnessing the sexual assault of his sister. Next, appellant asserts that "the evidence is insufficient to show [appellant] had the *mens rea*" for the offense. In that regard, appellant cites evidence that Gonzales was the primary abuser, and that appellant acted to remove J.F. from the environment when he asked A.T. to act as J.F.'s caretaker.

Count 2 of the indictment charged appellant with causing mental deficiency, impairment or injury to J.F. by "denying [him] access to adequate food, water, restroom facilities and hygienic products, by forcing [him] to stand for long periods of time, by forcing [him] to wear a diaper to school, and by striking [him] with a stick, belt, shoe and

13

the defendants' hands."   With respect to causation, the Texas Penal Code provides that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient."   TEX. PENAL CODE ANN. § 6.04(a) (West, Westlaw through 2015 R.S.).   Two combinations may exist to satisfy the requisite causal connection between the defendant's conduct and the required result:   (1) the defendant's conduct may be sufficient by itself to have caused the harm, regardless of the existence of a concurrent cause; or (2) the defendant's conduct and a concurrent cause together may be sufficient to have caused the harm.   *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986); *Umoja v. State*, 965 S.W.2d 3, 9 (Tex. App.—Fort Worth 1997, no pet.).

Dr. Rios testified that any prior trauma suffered by J.F. would only amplify the effects of the present abuse.   Dr. Rios also testified that the acts of abuse by Gonzales and appellant were, in and of themselves, sufficient to cause PTSD.   Dr. Rios explained that J.F.'s prior behavior and experiences would have been merely contributory to his PTSD.   Dr. Deuhn further testified that past traumatic events in J.F.'s life did not prevent him from functioning normally and were "small potatoes" compared to the present abuse. Dr. Deuhn also stated the prior events would not have made a difference in his conclusions.

We conclude that a rational trier of fact could have found from this evidence that J.F.'s mental deficiency, impairment or injury was caused by appellant and was not solely attributable to prior events.   *See Johnson*, 364 S.W.3d at 293–94; *Robbins*, 717 S.W.2d

14

at 351.

We now turn to appellant's argument that "the evidence is insufficient to show [appellant] had the *mens rea*" for the offense. Appellant argues that the evidence is insufficient to establish that he intentionally or knowingly caused serious mental deficiency, impairment, or injury because he acted to remove J.F. from the environment by arranging for J.F. to reside with A.T. However, appellant's argument fails to acknowledge the extensive evidence of appellant's active participation in the prolonged mistreatment of J.F., including: J.F. being singled out for frequent physical assaults; denial of basic necessities such as food, water, clean clothing, and hygiene; and various acts of humiliation. We conclude a rational trier of fact could have inferred from this evidence that appellant intentionally or knowingly caused serious mental deficiency, impairment, or injury to J.F. *See Johnson*, 364 S.W.3d at 293–94. We overrule appellant's second issue.

By his third issue, appellant further argues that the evidence is insufficient to support a conviction for Count 2 under the law of parties. Specifically, appellant maintains "the evidence was insufficient to show that [appellant] had the intent to cause serious mental deficiency, impairment, or injury or knew he was doing so." We have already concluded that the evidence is legally sufficient to support the intent element of the offense. Therefore, we need not address appellant's third issue. *See* TEX. R. APP. P. 47.1

### 3. Count 3

15

By his fourth issue, appellant argues "[t]he evidence is insufficient to show [appellant] intentionally or knowingly caused [J.F.] any bodily injury on or about May 12, 2013." Specifically, appellant maintains that he was at work on May 12, 2013, when Gonzales struck J.F., and that there is no evidence he had any knowledge of what occurred in his absence.

Count 3 of the indictment charged appellant with causing bodily injury to J.F. on or about May 12, 2013, by striking him with a stick and a belt. Third-degree injury to a child requires evidence of bodily injury. *See* TEX. PENAL CODE ANN. § 22.04 (a)(3), (f). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *Id*. § 1.07(a)(8). Under this definition, "[a]ny physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012).

"It is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997). The limitations period for injury to a child is ten years from the victim's eighteenth birthday. TEX. PENAL CODE ANN. § 12.01(6)(B) (West, Westlaw through 2015 R.S.). Therefore, the statutory limitations period for the offense had not yet expired, as J.F. was thirteen-years-old at the time of trial. The State presented evidence that appellant repeatedly hit J.F. resulting in bodily injury.

We conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant committed the offense of injury to a child prior to the date alleged in

16

the indictment and within the applicable limitations period. *See Johnson*, 364 S.W.3d at 293–94. We overrule appellant's fourth issue.

## III. JURY CHARGE ERROR

By his fifth and sixth issues, appellant argues he suffered egregious harm from error in the jury charge.

## A. Standard of Review

A claim of error in the jury charge is reviewed using the procedure set out in *Almanza v. State. Barrios v. State,* 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (citing *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984), *overruled on other grounds by Rodriguez v. State,* 758 S.W.2d 787 (Tex. Crim. App. 1988)). The first step is to determine whether there is error in the charge. *Barrios,* 283 S.W.3d at 350; *Ngo v. State,* 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Where, as here, appellant did not object to the charge, the error must be fundamental and will not result in reversal unless it was so egregious and created such harm that the defendant did not have a fair and impartial trial. *Barrios,* 283 S.W.3d at 350; *Almanza,* 686 S.W.2d at 171. The degree of harm is determined in light of the entire jury charge, the state of the evidence, including the contested issues and the weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Almanza,* 686 S.W.2d at 171. Appellant must have suffered actual, rather than theoretical, harm. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). To constitute egregious harm, the error must affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Id*. at 461–62.

17

**B.**     **Analysis**

**1.**     **Culpable Mental State**

By his fifth issue appellant argues he "suffered egregious harm by a charge that expanded the culpable mental state to include nature of his conduct and circumstances surrounding his conduct."   Specifically, appellant maintains that the abstract portion of the jury charge contained improper definitions for "intentionally" and "knowingly." Appellant further argues that the application portion of the jury charge did not limit "intentionally" or "knowingly" to the result of the offense—injury; serious injury; or serious mental deficiency, impairment or injury—because the application paragraph for each count included the means of causing the injury.

> The relevant definitions in the abstract portion of the charge were as follows:
>
> A person acts "intentionally" or with "intent", with respect to *the nature of his or her conduct* or to a result of his or her conduct when it is his or her conscious objective or desire to engage in the conduct or cause the result.
>
> A person acts "knowingly" or with "knowledge", with respect to *the nature of his or her conduct or to circumstances surrounding his or her conduct* when he or she is *aware of the nature of his or her conduct or that the circumstances exist.* A person acts "knowingly" or with "knowledge", with respect to a result of his or her conduct when he or she is aware that his or her conduct is reasonably certain to cause the result.

(Emphasis added).

As outlined above, injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct.   *Williams*, 235 S.W.3d at 750.   A result-oriented offense requires that the culpable mental state accompany the result of the conduct, rather than the nature of the conduct.   *Cook v. State,* 884 S.W.2d 485, 490 (Tex. Crim. App. 1994).   A charge which defines

18

"intentionally" or "knowingly" as they relate to the nature of the conduct as well as the result of the conduct is error. *Id.*

Here, the abstract portion of the charge permitted the jury to find appellant possessed the mens rea for each offense if it concluded that appellant acted either "intentionally . . . with respect to the nature of [his] conduct . . . when it is [his] conscious objective or desire to engage in the conduct" or "knowingly . . .with respect to the nature of [his] conduct or to circumstances surrounding [his] conduct when [he] is aware of the nature of [his] conduct or that the circumstances exist." Because the definitions in the abstract portion of the jury charge did not limit the culpable mental state to the result of appellant's conduct, the trial court committed error in submitting those definitions to the jury. *See Haggins v. State*, 785 S.W.2d 827, 828 (Tex. Crim. App. 1990) (finding error in jury charge which provided improper definitions for the culpable mental state for an injury to child offense); *see also Cook*, 884 S.W.2d at 491 ("Intentional murder under § 19.02(a)(1) is a 'result of conduct' offense, therefore, the trial judge erred in not limiting the culpable mental states to the result of appellant's conduct."). Therefore, we must assess whether the error resulted in egregious harm to appellant.

In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Hughes v. State*, 897 S.W.2d 285, 296 (Tex. Crim. App. 1994) (quoting *Cook*, 884 S.W.2d at 492 n. 6.). The relevant portions of the application paragraphs in the jury charge read as follows:

<u>COUNT 1</u>
Now, if you find from the evidence beyond a reasonable doubt that . . .
[appellant] did then and there intentionally or knowingly by act or omission
cause serious bodily injury . . .

<u>COUNT 2</u>
Now, if you find from the evidence beyond a reasonable doubt that . . .
[appellant] did then and there intentionally or knowingly cause serious
mental deficiency, impairment or mental injury . . .

<u>COUNT 3</u>
Now, if you find from the evidence beyond a reasonable doubt that . . .
[appellant] did then and there intentionally or knowingly cause bodily injury
. . .

<u>COUNT 4</u>
Now, if you find from the evidence beyond a reasonable doubt that . . .
[appellant] did then and there intentionally or knowingly cause bodily injury
. . . .

We note that the language in the application paragraphs appropriately limits the

culpable mental state to the result of the offense. In *Patrick v. State*, the Court of Criminal

Appeals addressed whether the inclusion of improper definitions of "intentional" and

"knowing" for the result-oriented offense of murder constituted egregious harm in light of

an application paragraph which properly instructed the jury to convict only if it found the

defendant did "intentionally cause the death" of the victim. 906 S.W.2d at 493. In

finding that no such harm resulted, the Court of Criminal Appeals explained:

Although the definitions of "intentionally" and "knowingly" indiscriminately
set forth the three alternative conduct elements, when those terms are
viewed in their factual context, it becomes apparent which conduct element
applies to which element of the offense. For instance, the application
paragraph states that appellant "did intentionally cause the death of [the
victim.]" The term intentionally directly modifies the phrase "cause the
death". Referring back to the definitions of culpable mental states, it is
obvious that the "result of conduct" and cause the result language are the
applicable portions of the full code definitions. We conclude that because
the facts, as applied to the law in the application paragraph, pointed the jury

20

to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states to proving the conduct element of the underlying offense.

*Id.* (citations omitted).

Similarly, the application paragraphs in this case point the jury to the appropriate portion of the abstract definitions for "intentional" and "knowing." Therefore, viewing the definitions in their factual context, it is apparent that the "result of conduct" and "cause the result" language are the applicable portions of the definitions. *See id.*

Turning to the remaining harm factors, we note the contested issues at trial did not focus on whether appellant possessed the required mens rea for the charged offenses. Rather, appellant's defense was that there was insufficient evidence that J.F.'s injuries constituted bodily injury, serious bodily injury, or serious mental deficiency, impairment or injury. Appellant further contested whether there was sufficient evidence establishing his presence during many of the acts of abuse. Appellant also argued that J.F's mental injuries were the result of prior trauma and were not due to anything that occurred while J.F. resided with appellant. Finally, the State's closing argument pointed the jury to the appropriate portion of the definitions for "intentional" and "knowing."

Considering the relevant harm factors, we conclude appellant did not suffer egregious harm as a result of the abstract definitions in the jury charge. *See Almanza,* 686 S.W.2d at 171. We overrule appellant's fifth issue.

### 2. Law of Parties

By his sixth issue, appellant argues he "suffered egregious harm from error in the application paragraph under the law of parties." Specifically, appellant maintains that the

application portion of the charge "permitted the jury to convict [appellant] for first degree felony injury to a child even if [appellant] had no knowledge that [Gonzales] intended serious mental deficiency, impairment or disability."

The application paragraph of a jury charge "specifies the factual circumstances under which the jury should convict or acquit," and the law must be correctly applied to the facts for the conviction to be proper. *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012). The Texas Penal Code provides that "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a) (West, Westlaw through 2015 R.S.).

In addition to providing for appellant's conviction as a principal actor, the jury charge for count 2 provided the following "law of parties" instruction:

> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.
>
> [I]f you find from the evidence beyond a reasonable doubt that on or about May 12, 2013 . . . [Gonzales] and [appellant] did then and there intentionally or knowingly, cause serious mental deficiency, impairment or mental injury to [J.F.] . . . and [Gonzales] and [appellant], then and there knew of the intent, if any, of [Gonzales] and [appellant] to intentionally cause Injury to a Child and the defendants, [Gonzales] and [appellant], acted with intent to promote or assist the commission of the offense by encouraging,

22

directing, aiding, or attempting to aid and commit the offense of Injury to a Child, you will find the defendants, [Gonzales] and [appellant], guilty of Injury to [a] Child as charged in the indictment.

Read in its entirety, the charge instructed the jury that before it could find appellant guilty under the theory of the law of parties, it had to find that he participated in the offense of injury to a child and intended the result of serious mental deficiency, impairment or mental injury to J.F. The instruction includes the requirement of intent to promote or assist in the commission of the offense of injury to a child, and incorporates repeated references under Count 2 to the specific result of the offense: "serious mental deficiency, impairment or mental injury to [J.F.]."

We conclude the charge correctly instructed the jury to convict appellant only if it found he had the requisite mental state for the offense. Therefore, appellant has not demonstrated jury charge error. *See Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). We overrule appellant's sixth issue.

### IV. INEFFECTIVE ASSISTANCE OF COUNSEL

By his seventh issue, appellant argues his trial counsel "was ineffective for failing to request an instruction for the lesser[-]included offense of reckless injury to a child and for failing to object to the charge errors noted above."

### A. Standard of Review and Applicable Law

To prevail on an ineffective assistance claim, appellant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). Our review of

23

counsel's representation is highly deferential, and we will find ineffective assistance only if appellant rebuts the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142.

"In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Lopez*, 343 S.W.3d at 142. "It is not sufficient that appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). When direct evidence is unavailable, we will assume counsel had a strategy "if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143. "In making an assessment of effective assistance of counsel, an appellate court must review the totality of the representation and the circumstances of each case without the benefit of hindsight." *Id.*

**B.    Analysis**

Appellant first argues that his trial counsel was ineffective "for failing to request an instruction on the lesser[-]included offense of reckless injury to a child." We note that "claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Id.* When an ineffective assistance claim is raised on direct appeal, the record is usually inadequately developed and does not sufficiently reflect the failings of trial counsel for an appellate court to fairly evaluate the merits of the claim. *Id.*

24

The record is silent regarding trial counsel's motivations for not requesting a lesser-included offense instruction. In the absence of evidence of trial counsel's motivation, we assume a strategic reason for counsel's actions, if one can be imagined. *Id.* In that regard, we note that trial counsel does not act deficiently in failing to request a lesser-included offense if he was pursuing an all-or-nothing trial strategy. *See Ex Parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004) (concluding that counsel was not ineffective for failing to request a lesser-included offense instruction on manslaughter when the defendant preferred to adopt an all-or-nothing trial strategy); *Lynn v. State*, 860 S.W.2d 599, 603 (Tex. App.—Corpus Christi 1993, pet. ref'd) (explaining that requiring a jury to opt between murder and acquittal, although risky, is sometimes successful). In the absence of a record supporting his claim, appellant cannot overcome the strong presumption that trial counsel's strategy was reasonable. *See Lopez*, 343 S.W.3d at 143.

Next, appellant argues his trial counsel was ineffective "for failing to object to an improper charge." Under this sub-issue, appellant relies on his arguments raised in issues five and six.

With respect to issue five, we held that appellant was not egregiously harmed by the improper inclusion of an abstract definition that failed to limit the culpable mental state to the result of appellant's conduct. As explained above, the charge included the specific mens rea in both the abstract portion of the charge, and the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions in the abstract portion of the charge. Under these circumstances, we conclude that

25

appellant has failed to demonstrate a reasonable probability that the result of the proceeding would have been different had defense counsel objected to the jury charge. *See Strickland*, 466 U.S. at 694; *Green v. State*, 891 S.W.2d 289, 299 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (concluding there was not a reasonable probability the result would have been different had trial counsel objected to erroneous definitions in abstract portion of the jury charge, where application paragraph focused the jury on the result of appellant's conduct.).   Therefore, we need not address whether appellant met his burden under the first prong of *Strickland*.   *See Strickland*, 466 U.S. at 697; *Bazanes v. State*, 310 S.W.3d 32, 42 (Tex. App.—Fort Worth 2010, pet ref'd).

Appellant also maintains his trial counsel was ineffective in failing to object to the portion of the jury charge concerning law of parties.   Given that we previously held that the charge was not erroneous, appellant has failed to establish *Strickland's* first prong. *See Strickland*, 466 U.S. at 689.

We overrule appellant's seventh issue.

## V.   CONCLUSION

We affirm the judgment of the trial court.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
16th day of June, 2016.

26